UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MANSON GULF, LLC                          CIVIL ACTION NO. 15-3627
                                          c/w 2:15-cv-06860
VERSUS

MODERN AMERICAN RECYCLING                 SECTION: "J" (2)
SERVICE, INC., ET AL.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This litigation arises from the death of longshoreman James "J.J." LaFleur when he fell 50 feet to his death after stepping through a hole on a decommissioned oil platform. The platform sat atop a barge chartered by Manson Gulf, L.L.C. ("Manson"), who ordered the hole's creation but did not cover the hole or warn J.J. of its existence. Following J.J.'s death, Manson filed a complaint seeking exoneration or limitation from liability. Modern American Recycling Service ("MARS"), who had employed J.J. as an independent contractor, answered the complaint and asserted various claims and defenses. Shortly thereafter, Angie LaFleur, J.J.'s surviving spouse, filed claims for damages against Manson and MARS, alleging negligence under both maritime and Louisiana law.[1]

This case was tried before the undersigned without a jury. At the conclusion of the trial, the Court took the matter under advisement. Upon consideration of all of the evidence and the arguments of counsel, the Court issues the following findings of fact and conclusions of law in accordance with Federal Rule of Civil procedure 52(a). To the extent any of the following findings of fact constitute conclusions of law, they

---

[1] The Court dismissed MARS from the above-captioned matter on December 15, 2016.

1

are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

## FINDINGS OF FACT

1. Claimant, Angie LaFleur, the widow of James LaFleur, is a person of the age of majority. She has brought claims individually, as executrix of J.J.'s estate, and as natural tutrix of the children born of her marital union with J.J.: L.L., D.L., and B.L. (collectively, "Claimants"). D.L. is now 18 years old; B.L. and L.L. are still minor children. All are residents of the state of Louisiana.

2. Manson is in the business of decommissioning oil-drilling platforms in the Gulf of Mexico.

3. MARS is in the business of dismantling steel structures and selling the metal for scrap.

4. In 2015, Manson contracted with Freeport-McMoran Oil & Gas for the purchase and removal of a 50-foot-tall platform, the BA A-23-A, from the Gulf of Mexico. Manson, in turn, contracted with MARS to dispose of the platform when brought to shore.

5. Manson decided to remove the platform from the oil-field in two separate four-leg sections before bringing it to the MARS scrap facility located in Gibson, Louisiana.

6. To remove one of the four-leg sections, Manson cut four holes in the grating of the platform, adjacent to each of the support legs. Rigging chains were then passed through the holes and around the legs to take hold of the platform. The platform was then lifted by crane, loaded onto the MARMAC 262, a barge

which Manson chartered to transport the platform, and welded into knee braces that had been specifically placed onto the barge to secure the platform.

7. Manson removed the rigging chains once the platform was secured on the barge, which, consequently, left four open holes in the grating.

8. No Manson personnel were sent back up onto the platform to mark or cover the holes in the grating—instead, the holes were left uncovered and unmarked.

9. Manson delivered the structure to MARS' dock in Gibson, Louisiana, before sunrise on June 16, 2015.

10. On the morning of June 16, 2015, a Manson project engineer, Dustin Clement, warned MARS personnel of the presence of excess oil in the pipes located on the platform, but made no mention of the unmarked holes located on the platform.

11. Afterwards, Dustin Clement left MARS' dock and no Manson personnel remained.

12. Jeff Smith, a MARS foreman in charge of riggers and cutters, then boarded the platform (still secured to the barge) to locate the presence of oil.

13. After Smith investigated for approximately ten minutes, J.J. joined Smith aboard the platform to lend a hand. J.J. was an independent contractor, employed by MARS to take inventories, do inspections, and perform other miscellaneous tasks.

14. Smith and J.J. walked across the platform for approximately ten to fifteen minutes.

15. As Smith and J.J. walked across the platform, they discussed the oil dilemma

and looked at the pipes that ran overhead. While turning, J.J. stepped through an unmarked hole. Smith, then several feet behind, attempted to intervene, but it was too late—J.J. fell 50 feet to the barge's deck and subsequently died from his injuries.

16. J.J. was initially unconscious after the fall but awoke and became combative during resuscitative measures. While conscious, J.J. screamed from pain associated with his injuries caused by the fall. J.J. was conscious for approximately ten to fifteen minutes.

17. J.J. was transported via ambulance to the hospital where he was pronounced dead. An autopsy performed by the Terrebonne Parish Coroner determined the cause of death to be "Closed Head Injury, Rupture of the Ascending Aorta, Tear in the Inferiour Vena Cava, Fall."

18. It is undisputed that J.J. fell through one of the holes that had been cut in the grating of the platform.

19. The hole clearly posed a "danger"—it was at such height to make death or grievous injury a near certainty for anyone who fell through it.

20. Manson had actual knowledge of the hole because it cut the hole before it delivered the platform to MARS.

21. Manson warned MARS only of the presence of excess oil onboard the platform. Dwight Caton, the owner of MARS, testified that locating excess oil is the "biggest concern of any decommission job," because an explosion could occur if a salvaging company, such as MARS, were to cut into a pipe filled with oil. Caton further testified that J.J.'s primary purpose for being on the platform

4

was to locate excess oil.

22. Manson did not warn MARS of the existence of uncovered and unmarked holes in the grating of the platform, on which J.J. had to walk in order to locate any excess oil.

23. Smith was the only witness to view the hole from J.J.'s vantage point. On the visibility of the hole, Smith explained that the platform's "grating can play tricks on your eye," and stated that the hole was not easily seen until one was right on top of it. In fact, Smith testified that from four to eight feet away, the hole in the platform looked like solid floor. Moreover, although Smith walked on the grating for approximately twenty-five minutes, he testified that he did not see the hole until J.J. fell through it.

24. Detective Charles Clark, who appeared on the scene shortly after the accident, testified that he could not see the hole before Smith showed him exactly where it was located. Detective Clark further explained that the hole was difficult to see because "[the grating] all looks even."

25. Regarding the size of the hole, Caton testified that the hole was approximately the size of two legal pads and he "still [did not] know how a person fit through" it.

26. The pictures of the hole taken from an angle—similar to the point of view of a person approaching the hole—depict the way in which the platform's grating, in Smith's words, can "play tricks on your eye" and make the opening difficult

to see.[2]

27. The pictures of the area surrounding the hole also depict how shadows on the grating likely would have impacted J.J.'s ability to detect the hole. The accident occurred at approximately 9:08 a.m. At such time, the equipment on top of the platform, including the skid and pipes, would have cast shadows on the grating of the platform, particularly in the direction of the hole. These shadows, juxtaposed against the grating, likely made the hole difficult to discern when walking across the platform that morning.

28. Regarding the foreseeability of the hole, Smith clarified that, though he expected some holes to be present, any holes are "typically covered" or marked. More pointedly, Smith explained that an uncovered, unmarked hole—such as the one that J.J. encountered—was "just not common at all." Similarly, Caton also testified that rigging holes are usually marked or covered. Furthermore, Lewis Saylor, a former welding supervisor for MARS, testified that it is common in the industry to mark holes.

29. Brandt Stagni, Manson's corporate representative, testified about Manson's practices of marking and/or covering holes. According to Stagni, Manson's employees conduct a "hazard hunt" before any structure is lifted, during which they identify dangerous conditions on the structure, such as holes or bad grating. In the event that a Manson employee discovers a hole, it is Manson's policy to mark or barricade the hole if it is in an area where a Mason employee

---

[2] As noted by the Fifth Circuit in *Manson Gulf, L.L.C. v. Modern Am. Recycling Serv., Inc.*, 878 F.3d 130, 136 (5th Cir. 2017).

6

is going to be actively performing work. Stagni testified that Manson's work on the top of the platform is complete once the structure is placed on the barge, and the rigging chains, which pass through the holes in the grating of the platform, are removed. Stagni testified that because Manson employees are no longer working on the top of the platform, the company does not require its employees to mark or close the holes that are left once the rigging chains are removed from the structure. Stagni further testified that due to the risks inherent in sending personnel back up to the platform to mark or cover such holes, Manson does not typically do so. However, Stagni testified that in the unusual event that a Manson employee must return to the platform, Manson would "safe [the platform] out against just like [Manson] do[es] when [Manson] first shows up . . . [s]o[,] if there[] is an open hole present in an area [where Manson is] going to be working in, [Manson would] make sure it[] [is] covered and marked."

30. Although Manson did not mark the holes that were left once the rigging chains were removed from the platform, Stagni testified that Manson did in fact mark other holes that it discovered during the pre-lift "hazard hunt." Evidently, the markings remained on the platform when the platform was subsequently delivered to MARS. In fact, Smith testified that while on the platform, he and J.J. could clearly see an area that had been marked off in order to warn of the presence of holes in the grating.

31. At all pertinent times, Manson was the bareboat charterer of the Barge MARMAC 262, on which J.J. was working at the time of his death. The value

of the Barge MARMAC 262 at the time of the incident was approximately $4,400,000.

32. At the time of his death, J.J. was working for MARS earning $56,395.00 per year. He has a work life expectancy of 20.7 years. His past and future loss of earnings amount to approximately $810,756.00, discounted to present value.

33. J.J. has left behind a surviving spouse, Angie LaFleur, and three surviving sons born of his marriage with Angie LaFleur, aged fourteen, fifteen, and sixteen at the time of his death. J.J. was a loving father and husband and maintained a close relationship with his wife and children. His wife and children have been deeply affected by his death.

## CONCLUSIONS OF LAW

1. Claimants' remedy against Manson is analyzed under the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 901 *et seq*.

2. The right of ship repairers, longshoremen, and other persons covered by the LHWCA to sue a vessel owner for negligence arises exclusively under 33 U.S.C. § 905(b).[3] The duty of a vessel owner to LHWCA-covered employees of independent contractors working aboard a vessel is governed by the principles

---

[3] 33 U.S.C. § 905(b) provides in relevant part:

> In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person ... may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void.... The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter.

enunciated in *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 101 S. Ct. 1614, 68 L. Ed. 2d 1 (1981). *See Lormand v. Superior Oil Co.*, 845 F.2d 536, 541-42 (5th Cir. 1987); *see also Hill v. Texaco, Inc.*, 674 F.2d 447, 451 (5th Cir. 1982) (applying the LHWCA and *Scindia* to an independent contractor working aboard a vessel). The parties agree that *Scindia* and its progeny apply in this case.

3. Under *Scindia,* a company such as Manson owes only three duties to workers like J.J.: (1) the turnover duty, (2) the duty to exercise reasonable care in areas under the active control of the vessel (the "active control duty"), and (3) the duty to intervene in the event that the stevedore is acting in an obviously improvident manner (the "duty to intervene"). *Kirksey v. Tonghai Maritime*, 535 F.3d 388, 391 (5th Cir. 2008); *see also Moore v. M/V ANGELA*, 353 F.3d 376, 380 (5th Cir. 2003) (citing *Howlett v. Birkdale Shipping Co.,* 512 U.S. 92, 98, 114 S.Ct. 2057, 129 L.Ed.2d 78 (1994)).

4. This Court previously granted summary judgment in favor of Manson with respect to the active control duty and the duty to intervene. Accordingly, the only issue that remains is whether Manson breached its "turnover duty."

5. The turnover duty relates to the condition of the ship upon the commencement of stevedoring operations, *Moore*, 353 F.3d at 380–81 (citing *Scindia*, 451 U.S. at 167), and encompasses two distinct-but-related obligations. First, the vessel owner "owes a duty to exercise ordinary care under the circumstances to turn over the ship and its equipment in such condition that an expert stevedore can carry on stevedoring operations with reasonable safety." *Kirksey*, 535 F.3d at

392 (citing *Federal Marine Terminals, Inc. v. Burnside Shipping Co.*, 394 U.S. 404, 416-17 n. 18 (1969)). And second, the vessel owner "owes a duty to warn the stevedore of latent or hidden dangers which are known to the vessel owner or should have been known to it." *Id.* (citing *Howlett*, 512 U.S. at 99-100).

6. Regarding the latter duty, a vessel owner need not warn of "dangers which are either: (1) open and obvious or (2) dangers a reasonably competent stevedore should anticipate encountering." *Id.* (citation omitted). "If the longshoreman knew of the defect, then it is considered open and obvious." *Greenwood v. Societe Francaise De*, 111 F.3d 1239, 1246 (5th Cir. 1997) (citations omitted); *see also Scindia,* 451 U.S. at 167 (a vessel's duty to warn extends to defects unknown to "the stevedore and which would not be obvious to or anticipated by him if reasonably competent in the performance of his work"). That being said, even if a hazard is open and obvious, a vessel owner may still be liable where the employee has no alternative but to work in the unsafe condition or leave the job. *Kirksey,* 535 F.3d at 396; *see Morris v. Compagnie Maritime Des Chargeurs Reunis,* 832 F.2d 67, 71 (5th Cir. 1987) (a longshoreman faced with such a hazard "need show only that the circumstances made safer alternatives unduly impractical or time-consuming").

7. A court's inquiry into whether a condition is "open and obvious" should take place from the perspective of the injured longshoreman." *Manson Gulf, L.L.C. v. Modern Am. Recycling Serv., Inc.*, 878 F.3d 130, 136 n. 2 (5th Cir. 2017).

8. The hole in question was neither "open and obvious" nor a danger that a reasonably competent stevedore would anticipate encountering.

9. As discussed *supra*, neither Smith nor J.J. noticed the hole in the grating prior to the accident. Moreover, Smith, the only person to view the hole from J.J.'s vantage point, testified that the hole in the grating looked like solid grating floor. Detective Clark also testified that he was unable to see the hole before Smith showed him exactly where it was located because "the grating all looks even."

10. In addition, other factors, such as the shadows present on the surface of the grating, along with Smith's testimony that the grating can play tricks on one's eye, likely rendered the hole not obvious from J.J.'s perspective.

11. Further, although rigging holes are not necessarily uncommon on platforms like the one at issue, testimony, which the Court finds credible, established that such holes are typically covered or marked. In this case, Smith and J.J. noticed an area of the platform which had been marked off, presumably by Manson, to warn of the presence of holes. To the extent that Manson contends that J.J., as a reasonably competent stevedore, should have anticipated for holes to be present, the Court finds that such an expectation would naturally be lessened if, as is the case here, it appears that such holes had already been discovered and marked. Here, Manson warned J.J. of one overhead hazard—the oil in the pipes—while ostensibly, yet inadequately, protecting him against another—the hole in the grating. As such, the Court concludes that under the particular circumstances in this case, the danger posed by the hole in the grating was neither "obvious" nor one that a reasonably competent stevedore would necessarily anticipate.

12. Manson failed to exercise ordinary care under the circumstances when it turned over the vessel to MARS and failed to warn of the hole, and failed to cover or mark the hole.

13. Claimants demonstrated by a preponderance of the evidence that Manson's breach of its turnover duty was the sole proximate, legal, and factual cause of this accident.[4]

14. J.J.'s actions at the time of the accident were reasonable under the circumstances and he is therefore free from fault.

15. The Court finds that Claimants are entitled to recover the following damages:

    a. $400,000.00 for J.J.'s pre-death suffering,

    b. $810,756.00 in economic loss,

    c. $1,500,000.00 in general damages to Angie LaFleur,

    d. $500,000.00 in general damages to B.L.,

    e. $500,000.00 in general damages to L.L., and

    f. $500,000.00 in general damages to D.L.

---

[4] The Court also finds that Manson is not entitled to exoneration or limitation. The Limitation of Liability Act generally limits a vessel owner's liability to the value of the vessel, post casualty, plus any pending freight. 46 U.S.C. § 30505. In the trial of a limitation proceeding, the burden of proof is divided between the parties, and there is a two-step analysis. The claimants must prove that the destruction or loss was caused by the negligence of the vessel. *Trico Marine Assets Inc. v. Diamond B. Marine Services Inc.*, 332 F.3d 779, 789 (5th Cir. 2003). The burden then shifts to the shipowner to demonstrate that the negligence that caused the damage was not within its "privity or knowledge." *Id.* "'Privity or knowledge' implies some sort of 'complicity in the fault that caused the accident.'" *Brister v. A.W.I., Inc.*, 946 F.2d 350, 355 (5th Cir. 1991). As discussed *supra*, the Court finds that the accident was caused by Manson's breach of its turnover duty. Further, Manson acknowledges that it cut the hole which caused J.J.'s death.

**CONCLUSION**

Based on the foregoing Findings of Fact and Conclusions of Law, Manson is liable to Claimants for $4,210,756.00 in damages. All costs other than attorneys' fees shall be borne by Manson in accordance with Federal Rule of Civil Procedure 54(d). Judgment will be entered accordingly.

New Orleans, Louisiana, this 22nd day of August, 2018.

_____
CARL J. BARBIER
U.S. DISTRICT COURT JUDGE